AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Vineeta Singh,<br><br>*Defendant(s)* | )<br>)<br>) Case No.<br>)<br>)<br>) 3-19-71422<br>) |

**UNDER SEAL**
FILED
AUG 30 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
JCS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __September 21, 2017__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: ___/s/___
WILLIAM FRENTZEN
Assistant United States Attorney

_____
*Complainant's signature*
Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __8/30/2019__

_____
*Judge's signature*

City and state: __San Francisco, California__   Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

1-MJS

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

## I.  INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for VINEETA SINGH ("SINGH").

2. There is probable cause to believe SINGH, while employed as a social worker for a skilled nursing facility in Hayward, California, engaged in a scheme to commit Medicare fraud by facilitating the payment of kickbacks and likewise accepting kickbacks in exchange for patients she referred from the facility, in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback act.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI cooperating witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. During the course of this investigation, the UCE held multiple in-person audio and video recorded conversations with SINGH, in 2017 and 2018, in which SINGH receives kickback payments in exchange for the referral of patients and likewise facilitates the payment of kickbacks to co-conspirators.

### B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

5. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

6. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

7. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

8. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

9. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal

HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

10. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

11. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

12. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

**B. COMPLAINANT**

13. SINGH, is a 42 year old female who is believed to reside in Hayward, California. SINGH was a Director of Social Work for Hayward Hills Health Care Center, a skilled nursing facility, located at 1768 B Street, Hayward, California.

14. While employed as a social worker at Hayward Hills Health Care Center, SINGH accepted kickback payments in the form of cash from UCE and CW-1 in exchange for the referral of home health and/or hospice patients to HHA Alpha. SINGH also facilitated the payment of kickbacks by introducing UCE and CW-1 to health care professionals willing to engage in the scheme.

5

### C. STATUTES VIOLATED

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly, or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

16. **Title 42, United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

### II.  PROBABLE CAUSE

### A. SINGH ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF PATIENTS

17. Through CW-1's position with HHA Alpha, CW-1 became familiar with SINGH and was aware of SINGH's kickback relationship with AMITY HOME HEALTH CARE ("AMITY"), an HHA located in Hayward, California. On April 18, 2017, CW-1 engaged in a conversation with SINGH via text message in an attempt to meet with her to discuss a patient referral system similar to what she had with RIDHIMA "AMANDA" SINGH ("AMANDA"), the owner of AMITY.

18. On April 26, 2017, CW-1 met with SINGH in person to discuss CW-1's and UCE's business plan to increase the patient census of HHA Alpha because they would eventually be buying the company. This meeting was audio recorded. CW-1 told SINGH she could refer home health or hospice patients to HHA Alpha and receive a kickback. CW-1 asked SINGH if she wanted a monthly retainer or a per patient referral method of compensation. SINGH elected compensation per patient. SINGH agreed to send patient referrals to HHA Alpha in accordance with CW-1's business proposal by referring patients slowly and gradually referring more over an 18 month period. CW-1 and SINGH agreed the kickback amount for each patient referral would be $300 to $400. SINGH told CW-1 she would not tell

6

anyone about her participation in the business plan. SINGH acknowledged AMANDA from AMITY paid SINGH for patient referrals as well but did not tell CW-1 how much. SINGH admitted AMANDA did not come into SINGH's workplace to pay her because she does not want people to see her paying kickbacks to SINGH. SINGH requested CW-1 not come to her workplace either to pay her kickbacks. SINGH was concerned about others finding out about their business plan and asked CW-1 if CW-1 was recording their conversation. Set forth below is an excerpt of their conversation:

| Speaker | Statement | Additional Explanation[6] |
|---|---|---|
| CW-1: | That's what I wanted to ask you like I don't wanna be walking in the facility too much because I | CW-1 says this because he knows others in the facility are aware of health care professionals who come to the facility for the purpose of paying kickbacks and he is acknowledging SINGH is aware of this. |
| SINGH: | Yeah I don't want you. | |
| CW-1: | That's right because I know. | |
| SINGH: | You know Amanda doesn't do that. | CW-1 took this to mean that SINGH acknowledges AMANDA does not come into the facility to pay kickbacks because she does not want others to know why she is there. |
| CW-1: | Right. | |
| ... | | |
| SINGH: | So how, so you want, what, what do you want more from me? What, what, what. | |
| CW-1: | I need to. | |
| SINGH: | You want both? | SINGH asks CW-1 if CW-1 wants patient referrals for home health and hospice. |
| CW-1: | Uh. | |
| SINGH: | You want home health and uh | |
| CW-1: | That's fine I. | |
| SINGH: | Hospice, both? | |
| CW-1: | Exactly since we are doing both uh and also I need to show a s-stead-steady growth because I have investors involved in it with me so we you wanna take it to where we can go and sell it off at a higher uh IPO price. | CW-1 explains the business plan with UCE. They plan to increase the patient census of HHA Alpha in order to sell it at a later date for a higher price. |
| ... | | |

---

[6] The "Additional Explanation" columns in this affidavit provide my summary opinion and/or explanation of the adjacent text in the "Statement" column. My summary opinion and/or explanation is based on my training and experience of the criminal statutes violated and of the UCO.

7

| SINGH: | So, when, when do you really want me to start helping you, you mean uh? | |
|---|---|---|
| CW-1: | I just want you to start with I want two and three from you and then next Monday you can go three and four and you keep increasing slowly, gradually so it's a steady growth not like all of a sudden uh – | "Two", "Three", and "Four" is in reference to the amount of patient referrals. |
| SINGH: | (Unintelligible) ("UI") | |
| CW-1: | - things change [CW-1] came in and this census went to six hundred. We don't wanna show a crazy growth. We wanna show the growth that the numbers are increasing. | CW-1 explains a sudden increase in their census might alarm authorities to potential fraud so a slow increase in patient referrals from SINGH is safer. |
| SINGH: | Okay. | |
| … | | |
| SINGH: | So this is what I'm gonna do. | |
| CW-1: | Okay. | |
| SINGH: | I have to still talk about like the home health and the hospice like what's the what-what-what's in for me? | CW-1 understood this statement to mean, SINGH was asking CW-1 for a kickback payment amount. |
| CW-1: | Well you-you tell me because that's why I told you remember whatever Am-Amity's paying you that's fine. Whatever other companies are doing it. | CW-1 asks for SINGH to disclose how much she is getting paid by other HHAs, i.e. AMITY. |
| SINGH: | But no- | |
| CW-1: | I don't wanna do. | |
| SINGH: | AMITY's doing real well, you guys are not. I cannot ask the same thing right. | |
| CW-1: | What are they doing? | CW-1 asks SINGH how much AMITY pays her. |
| SINGH: | No I don't need to say that. | |
| CW-1: | So-so uh what? | |
| SINGH: | You, you'll do | |
| CW-1: | Uh of course I know. | |
| SINGH: | Whatever you will. | |
| CW-1: | Oh (UI) whatever you gotta do. | |
| SINGH: | Whatever you will that's-that's fine. | |
| CW-1: | AMANDA's your (UI) so she probably do a lot better. I need to (UI) I don't wanna insult you. | |
| SINGH: | I don't have to tell. No I'm just gonna full and give it to you and she will know. | |
| CW-1: | So you, you monthly, or | CW-1 asks SINGH if she wants to get paid a monthly amount for patient referrals. |
| SINGH: | No-no I'll, I'll go with you for pay for I think we'll just do one by one now. | SINGH states she wants to be paid per patient referral. |
| CW-1: | One by one, okay. | |
| SINGH: | Yeah. | |
| CW-1: | So you just wanna do one uh each patient, okay and I don't wanna throw a number out. You-you tell me so I would. | CW-1 acknowledges SINGH is requesting to be paid per patient. CW-1 asks again for an amount SINGH wants to be paid per patient referral. |
| SINGH: | No I'll tell you. | |
| CW-1: | Okay. | |
| SINGH: | I'll text you. | |

8

| | | |
|---|---|---|
| CW-1: | Okay that's fine. | |
| SINGH: | I'm shy. | |
| ... | | |
| SINGH: | So what was your uh what-what did you want it for the home health like how much were you looking at? | |
| CW-1: | I just want it to be realistic I know uh AMITY was can-can pay from three hundred to four hundred I don't know if they pay more than that. Hospice I don't know because (UI) so I wanna stay within the re-, re-, reasonable market area and I'm not looking for a short term it's eighteen months and then we gonna grow more. | CW-1 offers $300 to $400 for each patient referral. |
| SINGH: | Okay. | SINGH agrees to the payment amount. |
| CW-1: | So something that I can keep continue and I wanna grow slowly I don't want I don't want you think. | |
| SINGH: | Yeah I-I have to wait go slow. | |
| CW-1: | Tomorrow I have I'm-I'm gonna ask for five more. No-no I'm not gonna do that. | |
| SINGH: | No okay. | |
| CW-1: | So let's do it two or three a month the max and we can go four five six just a gradual increase. (UI) | |
| SINGH: | Yeah no that's fine. Soon I'll text you. | |
| CW-1: | Okay. | |
| SINGH: | Text you for yeah I'm, I'm I might give you one the patient is going next week. | |

19. On April 28, 2017, SINGH exchanged text messages with CW-1 advising of a home health patient referral. Set forth below is an excerpt of the text message exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SINGH: | Hey I have 1 for you tomorrow | I believe "1" is in reference to one patient referral. |
| SINGH: | But not certain yet | |
| CW-1: | Awesome | |
| CW-1: | Hospice or home health | "Hospice or home health" is in reference to the type of services the patient needs. |
| SINGH: | Home health | |
| SINGH: | Discharging on Wednesday now | |
| ... | | |
| CW-1: | Fax to my att at [HHA Alpha fax number] as we discussed its better that way unless you want me to come pick up the referral ☺ | |
| CW-1: | Also I am planning to go to Eden on Monday will confirm on Monday as well | |
| ... | | |
| SINGH: | Come and pick referral on Tuesday | |
| SINGH: | If that's ok with you | |
| CW-1: | Sure what time | |

9

| CW-1: | Also still waiting on how would you like to do it….. only if you are out of the shy mode now [emoji] both for HH and Hospice. | CW-1 is referring to how SINGH would prefer to get compensated for patient referrals. |
| SINGH: | Will let you know | |
| CW-1: | [emoji] sweet | |

20. On May 2, 2017, SINGH sent the patient referral from her facility to HHA Alpha. CW-1 picked up the paperwork for the patient referral at SINGH's workplace. In the parking lot of her workplace, CW-1 paid SINGH $300 for the patient referral. This meeting was audio recorded.

21. SINGH continued to communicate with CW-1 regarding participation in the kickback scheme and continued to refer patients to HHA Alpha in exchange for kickbacks. SINGH was introduced to UCE on June 19, 2017. CW-1 and UCE explained their business plan and kickback scheme to SINGH once again. SINGH agreed to continue participating in the scheme.

22. On September 19, 2017, SINGH sent a text message to CW-1. The text stated "I have a patient for you". SINGH and CW-1 exchanged text messages about the patient referral.

23. On September 20, 2017, UCE and SINGH exchanged the following text messages to arrange a meeting for UCE to pay SINGH kickbacks for the referral of the patient.

24. On September 21, 2017, SINGH exchanged text messages with UCE and CW-1 discussing the referral of a potential hospice patient and of another patient. SINGH indicated an acquaintance of hers had assisted her in the referral of one of the previous patients she referred. UCE and SINGH exchanged the following text messages:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Ms. V, I know you were talking to someone yesterday. Not sure where that went. Am I meeting with just you at 12:30? | UCE asks if SINGH is bringing the unidentified acquaintance with her to the meeting. |
| SINGH: | She doesn't want to be involved | |
| SINGH: | She said for me to handle her discharges | |
| UCE: | Fine, we are low pressure guys and only want people who are comfortable. | |
| SINGH: | Trust me guys there is a reason that she can't be in the picture | SINGH is referencing her acquaintance will not meet with CW-1 and UCE to get paid a kickback because she already worked for another HHA. |
| SINGH: | She works for another home health company | |
| SINGH: | She's too scared | |
| SINGH: | Her name is [acquaintance] | |

10

25. On September 21, 2017, later that day, UCE met with SINGH in the parking lot of her employer and paid her $1,500 in cash for the referrals of three patients; $500 of the $1,500 was to be split between SINGH and her acquaintance. This meeting was audio and video recorded. Set forth below is an excerpt of the meeting:

| | | |
|---|---|---|
| UCE: | So, so tell you what I do. Like first of all, I'm happy, I'm happy to give her five hundred through you right now, but we don't wanna maintain it this way, I mean, so what we can do is | |
| SINGH: | Yeah. I know you would like to meet with her | |
| UCE: | So, so what I'll say is, it's up to you. The five hundred you can split, give to her, do whatever you like. If she meets with us and you haven't paid her, I'll pay her. If she meets with us and you've paid her, I'll pay you. | |

. . .

| | |
|---|---|
| UCE: | And guess what I have for you? |
| SINGH: | You have my present. |
| UCE: | Uh, so this is, a thousand for the two patients. |
| SINGH: | Okay. |
| UCE: | And then this is five hundred for her for you guys to split however you like. |
| SINGH: | Okay. |

26. During the course of the UCO, SINGH met with CW-1 and/or UCE on at least six occasions, during which SINGH accepted cash in exchange for the referral of patients to HHA Alpha and/or introducing UCE to other individuals willing to engage in the kickback scheme. In total, SINGH accepted over $5,200 in cash from CW-1 and/or UCE and referred approximately ten patients to HHA Alpha.

B. **SINGH INTRODUCES UCE AND CW-1 TO DR. GERALD MYINT, NICOLE SUNO, AND INDIVIDUAL 1**

   a. **SINGH introduces UCE and CW-1 to Dr. GERALD MYINT ("MYINT")**

27. On May 24, 2017, CW-1 and SINGH exchanged text messages regarding the referral of physicians who might be willing to accept kickbacks in exchange for patient referrals. Set forth below is an excerpt of the text message exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Lol we will talk on Friday. Do you know physician who would like to work with us | CW-1 is referring to physicians who would accept kickbacks for patient referrals. |
| SINGH: | Yes | |
| CW-1: | If so we can work something out | CW-1 is referring to paying SINGH for physicians she refers who are willing to accept kickbacks. |
| CW-1: | Who | |
| SINGH: | [Doctor 1] | |
| SINGH: | Gerald myint | |

28. On June 16, 2017, CW-1 and UCE visited MYINT at his office located in Hayward, CA. This meeting was audio and video recorded. MYINT asked CW-1 and UCE who referred them and they shared that SINGH provided the connection. During the meeting, MYINT received text messages from SINGH. MYINT explained he was checking the texts "so I [MYINT] will know how to handle." UCE and CW-1 understood this to mean MYINT wanted to know whether or not he could openly discuss payment for patient referrals during the meeting. The following is an excerpt of the conversation:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Did she text you though? She said that she's texting you right now? | "She" is in reference to SINGH. |
| MYINT: | Oh let me see. | |
| CW-1: | Ok. I wanna make sure we're on the same page. | |
| MYINT: | I can see. So I will know how to handle. | This is in reference to MYINT wanting to know whether or not he could openly discuss payment for patient referrals. |
| CW-1: | Ok. If you're walking out. Maybe we can walk out and I'll call her... | |
| MYINT: | I was just text. I said... | |
| CW-1: | I'm ok with you. | |
| MYINT: | [UI] doesn't matter for me. | |

29. Following the meeting with MYINT, CW-1 placed a call to SINGH and discussed whether or not CW-1 should pay MYINT. SINGH indicated she had already communicated with MYINT about payment. An excerpt of the conversation is below:

30.

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Ok. So, did you talk to him already? | |
| SINGH: | I talked to him. | |
| CW-1: | So let him know that that um I'm dropping off an envelope for him. So he knows. Can you text him that? So, I don't wanna be off guard. | CW-1 mentions an envelope which contains cash. CW-1 asks SINGH if CW-1 should pay MYINT now for patient referrals. |
| SINGH: | But if he but if he didn't give you a patient, then why would you drop off an envelope? | CW-1 understood SINGH's statement to mean she acknowledges the envelope contains cash. SINGH is asking why CW-1 would pay MYINT prior to a patient referral. |
| CW-1: | So I gain his trust. Otherwise he will not give it to me. Why would why would you think he would give it to me? | CW-1 explains a payment in advance would gain MYINT's trust. |
| SINGH: | Does he have any does he have any patient? | |
| CW-1: | He does. | |
| SINGH: | Which one? | |
| CW-1: | I don't know. He's coming down right now, so. He said he has a lot of patients and he will talk to you and he will probably meet me ah he's coming. I don't wanna talk to you in front of him or. | |
| SINGH: | Yeah, I told him already [unintelligible] will take care of you. | I believe the statement "take care of" is referring to paying MYINT cash for the referral of patients. |

### 1. SINGH is paid for introducing UCE to MYINT

31. On June 19, 2017, CW-1 and UCE met with SINGH. This meeting was audio and video recorded. UCE paid SINGH $500 cash for her referral of MYINT. During the meeting UCE told SINGH: "Let's walk towards the car because that way we can do this from there. So, ok, so the general thing that we want is, we want a wide base. If we just do a few doctors, and they're doing too much, it attracts too much attention. We want a wide base of doctors. They start slowly and they just slowly increase over time that way it doesn't attract any attention. Every doctor you give us, $500, okay?" SINGH responded: "Okay".

13

32. During the course of the UCO, MYINT met with CW-1 and/or UCE on at least five occasions, during which, MYINT accepted cash in exchange for patient referrals to HHA Alpha. In total, MYINT accepted $3,000 in cash from UCE and attempted to refer three patients to HHA Alpha.

### b. SINGH introduces UCE to INDIVIDUAL 1 ("INDIVIDUAL 1")

33. On December 4, 2017, CW-1 spoke with SINGH via telephone and discussed recruiting more participants for the kickback scheme as well as setting up a meeting to discuss how AMANDA fraudulently billed Medicare. This conversation was audio recorded. During the conversation, CW-1 told SINGH a female, INDIVIDUAL 1, called and requested to meet with CW-1 to discuss business because she had spoken to SINGH. SINGH acknowledged she knew INDIVIDUAL 1 and had indeed "been talking business" with her. SINGH indicated INDIVIDUAL 1 worked with case managers at Eden Hospital and might be able to refer patients to HHA Alpha from the hospital. An excerpt of the conversation is below:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Okay. Hey, what's her name called me, [INDIVIDUAL 1] | |
| SINGH: | Who's that? | |
| CW-1: | [INDIVIDUAL 1] or um somebody from [facility] | |
| SINGH: | Regarding our HMO patient? | |
| CW-1: | No, she called and she said hey, how is everything working out for you guys. Ah she mentioned… | |
| SINGH: | Oh [INDIVIDUAL 1] she's my friend. | |
| CW-1: | [INDIVIDUAL 1], okay. How do you spell that name? | |
| SINGH: | [INDIVIDUAL 1] Why, what, what did she say? | |
| CW-1: | She said hey, how's everything working up there? Everything is good. Are you getting any patients? I'm like, yeah, here and there, not many. Ah then she said okay, lets, lets meet up. I spoke to Vineeta too, lets meet up and lets ah, lets talk business. | |
| SINGH: | Yeah, lets talk business. | I believe "let's talk business" refers to involving INDIVIDUAL 1 in the kickback scheme. |
| CW-1: | So… | |

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SINGH: | We've been talking business and I told her that I'll be from (UI) like ah not gonna be one person. I, I don't know what to do with Amanda. The problem is ah you know she really takes care of us so that's the biggest problem that we are having that um… And of course you know she really, when I say she really takes care of me… | SINGH acknowledges she had spoken to INDIVIDUAL 1 about CW-1 and the kickback scheme. I believe SINGH is referring to mentions her kickback relationship with AMANDA when she refers to the statement "she really takes care of me." |

34. On February 6, 2018, CW-1, UCE, SINGH, and INDIVIDUAL 1 met to discuss the kickback for patient referrals scheme. The meeting was audio/video recorded. INDIVIDUAL 1 and SINGH both acknowledged having a relationship with YI WEN SHIH, also known as NICOLE SUNO ("SUNO"), who worked at Asian American Home Health. An excerpt of the conversation is below:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| INDIVIDUAL 1: | Hold on, are you only like East Bay, what is your territory? | INDIVIDUAL 1 asks CW-1 what the territory is HHA Alpha covers. |
| CW-1: | So we have a fifty mile radius to go as far as Stockton, Fairfield. | HHAs are only allowed to operate within a 50 mile radius of the HHA office location. CW-1 is explaining the territory in which HHA is allowed to operate. |
| INDIVIDUAL 1: | You go to Stockton too? | |
| CW-1: | Yeah, Manteca | |
| INDIVIDUAL 1: | Oh | |
| SINGH: | So that's why we involve Nicole. | |
| CW-1: | Los Gatos | |
| INDIVIDUAL 1: | Yeah | |
| SINGH: | Because Nicole sometimes has trouble um with the | |
| INDIVIDUAL 1: | No, it's Contra Costa, right? | |
| CW-1: | Yes | |
| INDIVIDUAL 1: | Yeah, because the Nicole that we were talking about, she works with Asian American but they don't cover Contra Costa. | |

35. Following the meeting, CW-1 and SINGH, spoke via telephone and discussed the possible kickback relationship with INDIVIDUAL 1. The conversation was audio recorded. An excerpt of the conversation is below:

15

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SINGH: | She was very happy meeting you guys ... | |
| SINGH: | I told her how I work with these guys and you know she said, I'll let you handle that. | SINGH was acknowledging she had told INDIVIDUAL 1 about the kickback relationship and she told SINGH, SINGH could handle the kickbacks. |
| CW-1: | I didn't wanna say anything at the first meeting because I wasn't sure. I know she was open but we didn't wanna throw any numbers out there. | CW-1 was referring to the amount of money paid for each patient referral. |

36. On or about February 7, 2018, CW-1, UCE, and SINGH, exchanged the following text messages:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SINGH: | Keep in touch with [INDIVIDUAL 1] | |
| UCE: | Will do. | |
| SINGH: | Who else you want to connect with out there? | |
| UCE: | If you think you have a doctor who plays the way that we do we're happy to meet him | "plays the way that we do" is in reference to paying kickbacks for patient referrals |
| SINGH: | [CW-1]! Nichole will call you today | SINGH is acknowledging she understands the meaning of the phrase and is referring "Nichole", (SUNO), to UCE and CW-1. |

c. **SINGH introduces UCE to YI WEN SHIH, also known as NICOLE SUNO ("SUNO")**

37. On January 6, 2018, CW-1 spoke with SINGH via telephone. This conversation was audio recorded. SINGH indicated SUNO had called to inform SINGH she had a Medicare patient whom she would be referring. SUNO was a marketer for Asian American Home Care, an HHA located in Alameda, California. CW-1 and SINGH discussed kickback payments for referrals by SINGH and SUNO. SINGH stated SUNO would send her the referral and then SINGH would send the referral to HHA Alpha. CW-1 indicated HHA Alpha could indeed accept the patient and agreed to meet with SINGH on or about the following Tuesday to pay her a kickback for SUNO's referral. SINGH stated: "Because I have to tell her that ah, so you'll bring it on Tuesday? You'll pay up on Tuesday, right?" CW-1 confirmed: "I can, I can stop by and see you Tuesday, yes." SINGH then responded: "Okay, let me call her." I believe "her" is referring to SUNO.

16

38. On April 5, 2018, UCE and CW-1 met in person with SUNO to discuss payment for the patient SUNO referred to HHA Alpha. The meeting was audio/video recorded. During the meeting, UCE paid SUNO a total of $500 in cash for the referral of one Medicare patient to HHA Alpha. After that meeting SUNO continued to try and refer patients for hospice to HHA Alpha. SUNO also attempted to refer doctors and other marketers to UCE and CW-1 as part of a patient referral kickback scheme.

39. During the course of the UCO, SUNO met with CW-1 and/or UCE on at least five occasions, during which SUNO accepted cash in exchange for the referral of a Medicare patient to HHA Alpha and as a retainer for future patient referrals. In total, SUNO accepted $3,500 in cash from CW-1 and/or UCE and attempted to refer 1 Medicare patient to HHA Alpha.

### III.   PROBABLE CAUSE FOR THE VIOLATION

#### A. TITLE 42 UNITED STATES CODE, SECTION 1320a-7b(b)(1)(A), THE ANTI-KICK BACK STATUTE

40. **Title 42, United States Code, Section 1320a-7b(b)(1)(A),** in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

41. Based on all of the foregoing, probable cause exists to believe that SINGH accepted kickback payments from UCE that were intended to induce SINGH to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

42. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by SINGH for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

43. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by SINGH in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

### B. TITLE 42 UNITED STATES CODE, SECTION 1320A-7b(b)(2)(A), THE ANTI-KICK BACK STATUTE

44. **Title 42 United States Code, Section 1320a-7b(b)(2)(A),** in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

45. SINGH facilitated the UCE's kickback payments to MYINT, SUNO, and INDIVIDUAL 1 in order to induce MYINT, SUNO, and INDIVIDUAL 1 to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

46. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by MYINT, SUNO, and INDIVIDUAL 1 for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(2)(A).

47. Therefore, there is probable cause to believe that SINGH's facilitation of UCE's kickback payments to MYINT, SUNO, and INDIVIDUAL 1 to induce MYINT, SUNO, and INDIVIDUAL 1 to send patient referrals to HHA Alpha, meets the definition of a kickback payment and violates anti-kickback statute.

### IV. CONCLUSION

48. Based on the foregoing, there is probable cause to believe SINGH conspired to facilitate the payment of kickbacks to MYINT, SUNO, and INDIVIDUAL 1, in exchange for patient referrals and likewise accepted kickbacks in exchange for her referral of patients, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and 42 U.S.C. § 1320a-7b(b)(2)(A).

/ /

/ /

/ /

## V.     REQUEST FOR SEALING

49. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this ___ day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

19